# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>WENFENG LU | Docket No.<br><br>MAGISTRATE'S CASE NO. **SA12-527M** |

| Complaint for violation of Title 18  United States Code §§ 371; 1832 | | |
|---|---|---|
| NAME OF MAGISTRATE JUDGE<br>ROBERT N. BLOCK | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>SANTA ANA, CA |
| DATE OF OFFENSE<br>November 16,  2012 | PLACE OF OFFENSE<br>Santa Ana, CA | Address of ACCUSED (IF KNOWN) |

**COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:**

See attached affidavit which is incorporated as part of this Complaint

CLERK, U.S. DISTRICT COURT
FILED
NOV 1 6 2012
CENTRAL DISTRICT OF CALIFORNIA
BY          DEPUTY

**BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:**

See attached affidavit which is incorporated as part of this Complaint

**MATERIAL WITNESSES IN RELATION TO THIS CHARGE:**

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>/s/ |
|---|---|
| | SPECIAL AGENT JO-LEIN QUARLES<br>Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br><br>ROBERT N. BLOCK | DATE November 16, 2012 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

**AUSA: MPT:em     REC: Detention**

**AFFIDAVIT**

I.  **INTRODUCTION**

I, Jo-Lein Quarles, being duly sworn, hereby depose and state the following:

1.  I am a Special Agent for the Federal Bureau of Investigation in Orange, California, and have been so employed for four-and-one-half years.  For the last two-and-a-half years, I have primarily worked on counterintelligence investigations involving the People's Republic of China ("PRC").  I have attended training on various aspects of counterintelligence investigations relating to the PRC with the FBI in Quantico, Virginia and other locations.  Based on my experience and training, I am familiar with efforts used to collect U.S. government and private industry information.  Prior to my employment as a Special Agent, I was an Intelligence Analyst with the FBI from October 2004 to December 2007.  In that position I assembled interpreted and presented information collected to enhance the FBI's counterintelligence efforts.  I graduated from Youngstown State University in 2003 with a Masters Degree in Business Administration.  I am assigned to the squad which investigated two espionage cases, resulting in convictions of two engineers and four co-conspirators, in the last five years on charges of acting as unregistered agents for, and providing defense information and trade secrets to, the PRC, <u>United States</u>

v. Chi Mak, SACR 05-293 (B)-CJC, and United States v. Dongfan
Chung, SACR 08-24-CJC.

## II.   THE PURPOSE OF THE AFFIDAVIT

2.   This affidavit is made in support of a complaint and
arrest warrant for Wenfeng LU ("LU") for violations of U.S.C.
§ 371 (Conspiracy) and 18 U.S.C. § 1832 (Theft of Trade Secrets)
and for an application for search warrant for his residence
located at 97 Splendor Drive, Irvine, California (the "Subject
Premises") for evidence of those offenses.

3.   As further described below, there is probable cause to
believe that LU, who works as a research and development staff
engineer at Edwards Lifesciences Corporation in Irvine,
California, ("Edwards") has transmitted, or is attempting to
transmit, trade secrets belonging to Edwards to individuals in
the PRC.  The information at issue concerns the design,
development, testing, and production of transcatheter heart valve
systems.  LU appears to be in the process of setting up a company
with other individuals in the PRC to manufacture medical devices
related to heart valves and heart surgery.  Since beginning at
Edwards in October 2011, LU has made four trips to the PRC,
several of which were proceeded by his unauthorized downloading
of trade secret information from Edwards' computer system or
emailing trade secret information to personal email accounts.  In

2

September 2012, Edwards became aware of suspicious email traffic between LU and persons in the PRC on Edwards' email system.  From that investigation, it is also known that LU is preparing to travel to the PRC on the night of November 17, 2012, returning on November 24, 2012.

4.  I make this affidavit based on my experience and training and based on personal knowledge and information that I have received from my participation in this investigation.  This affidavit is offered for the sole purpose of establishing probable cause to arrest LU and execute a search warrant at the Subject Premises, and does not set forth all of the facts of this investigation.

### III.  PREMISES TO BE SEARCHED

5.  The premises to be searched, located at 97 Splendor Drive, Irvine, California, is further described in Attachment A, which is incorporated by reference.

### IV.  SCHEDULE OF EVIDENCE TO BE SEIZED

6.  A list of the specific items to be seized from the Subject Premises is set forth in Attachment B and is incorporated herein by reference.  Based on my training and experience, as detailed above, there is probable cause to believe that items listed in Attachment B will be found at the Subject Premises.

**V.   APPLICABLE STATUTES**

7.   Section 371 of Title 18 provides, in pertinent part, as follows:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

8.   Section 1832 of Title 18 provides, in pertinent part, as follows:

> (a) Whoever, with intent to convert a trade secret, that is related to or included in a product that is produced for or placed in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly-
>
> > (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;
> > (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;
> > (3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;
> > (4) attempts to commit any offense described in paragraphs (1) through (3); or
> > (5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy, shall, except as provided in subsection (b),

4

be fined under this title or imprisoned not more than 10 years, or both.

VI. <u>PROBABLE CAUSE</u>

    A.   **Overview**

        1.   **Edwards Lifesciences**

9.  Based on information provided to me by outside counsel for Edwards, I know the following about the company: Edwards is considered a global leader in the science of heart valves and hemodynamic monitoring, which is the monitoring of the movement of blood and the pressure being exerted in the veins, arteries, and chambers of the heart.  After two acquisitions, Edwards was established by Baxter International Laboratories in 2000 as Edwards Lifesciences and began trading on the NYSE under the symbol EW.  It is headquartered in Irvine and has approximately 3,300 employees in the United States.  The company has established markets for its products in the U.S. and Europe, and in August 2012 opened an office in Shanghai, PRC, to begin marketing its transcatheter heart valve systems in Asia.

10.  Among the products made by Edwards is a transcatheter heart valve system, a tissue heart valve mounted inside a stent. Edwards sells a patented SAPIEN transcatheter heart valve for use in aortic valve replacement.  The device has been commercially available in Europe since 2007, and in the U.S. since 2011.  The company states that revenues from the sales of SAPIEN devices is

in the billions of dollars.  Since approximately 2009, Edwards
has been developing a concept for a transcatheter ultra low-
profile, self-expanding (i.e., no balloon used) aortic valve with
a motorized delivery system.  The motorized delivery system
allows for precise and accurate placement of the valve.  The
system, not yet ready for sale, is known as CENTERA.  Edwards has
filed for patents in the U.S., Europe, and Asia, including the
PRC.  The company estimates the potential revenues from the sale
of CENTERA to be equal to those from SAPIEN, and that the
potential market for CENTERA in the PRC would equal the markets
in the U.S. and Europe combined.  Edwards spent approximately
$500 million to develop SAPIEN, and the development costs for
CENTERA are expected to exceed $100 million.  According to the
company, the value of the trade secret information is not limited
to transcatheter heart valves, but has applications to balloon
angioplasty and stents, and the standard operating procedures a
company would need to operate in that industry.

### 2.   LU's employment at Edwards

11.   According to documents in his personnel file at
Edwards, LU is a legal permanent resident of the U.S.  He
received a bachelor's degree in 1994 from Tianjin University in
the PRC, a master's degree from National University of Singapore
in 1999, and a Ph.D. from CCF/Cleveland State University in 2004.

He began working as an R&D Staff Engineer at Edwards in October
2011.  He has been assigned to Edwards' Transcatheter Heart
Valves group his entire time at the company.  According to the
company, other than an initial three-month assignment to review
the CENTERA delivery system and to look into alternatives to its
metal cylinder catheter, LU's assignments at the company have
been narrow in scope.  He would have no need to perform
experiments or access documents relating to other company
products, such as SAPIEN, or to areas of research for CENTERA not
related specifically to its delivery system.  A recent work
review and inspection of LU's lab notebook by the company showed
that LU produced very little work product or documentation on how
he spent his working time.

        12.  On October 10, 2011, prior to starting work at Edwards,
LU signed an employment agreement that set out his obligations
regarding proprietary information, and restrictions on his
activities, including the following:

            2.2  <u>Restriction on Disclosure of Trade Secrets and
            Confidential Information</u>.  Employee agrees that he/she
            will not publish or disclose, or allow to be published
            or disclosed, Trade Secrets or Confidential Information
            to any person who is not an employee of Edwards unless
            such disclosure is necessary for the performance of

Employee's obligations under this Agreement, in which case (I) a properly executed Edwards confidentiality agreement must exist with the recipient of such information or (ii) it must first be authorized in writing by Edwards, through its General Counsel. Employee further agrees that he/she will not remove any Trade Secrets or Confidential Information from the offices of Edwards or the premises of any facility in which Edwards is performing work, or allow such removal, unless in the customary execution of employment duties, unless permitted in writing by Edwards, through its General Counsel. Upon termination of his/her employment with Edwards for any reason, Employee agrees to surrender to Edwards all documents and materials in his/her possession or control which contain Trade Secrets or Confidential Information. Employee expressly agrees that Employee will not make use of Trade Secrets or Confidential Information to engage in competition with Edwards or its affiliates at any time after the termination of his/her employment with Edwards for any reason. Upon termination of his/her employment with Edwards for any reason, Employee shall, if requested by Edwards, reaffirm in

8

writing his/her recognition of the importance of
maintaining the confidentiality of Edwards'
Confidential Information and Trade Secrets, and shall
reaffirm all of the obligations set forth in this
Agreement regarding such information.

13.   "Confidential Information" is defined as "information
relating to the present or planned business of Edwards and/or its
affiliates which has not been released publicly by authorized
representatives of Edwards," including: "Trade Secrets,
Inventions, know-how and products, customer, patient, supplier
and competitor information, sales, pricing cost, and financial
data, research, development, marketing and sales programs and
strategies, manufacturing, marketing and service techniques."

14.   "Trade Secrets" are defined to include "all information
encompassed in all Items, and in all manufacturing processes,
methods of production, concepts or ideas, to the extent that such
information has not been released publicly by duly authorized
representatives of Edwards, and also include all Trade Secrets as
that term is construed under the Uniform Trade Secrets Act."

15.   The employment agreement also contains restrictions on
conflicts of interest, and states: "Employee agrees that he/she
will devote utmost knowledge and best skill and efforts to the
performance of his/her duties, that he/she will remain loyal to

9

Edwards during the term of his/her employment, and that he/she is
not presently engaged in, and shall not during the term of his or
her employment with Edwards enter into, any employment or agency
relationship with any third party whose interests might conflict
with those of Edwards."  The agreement also provides that all
intellectual property developed by employees during their
employment at Edwards is the sole property of the company.

       16.  On October 8, 2011, LU signed an acknowledgment that he
had "read and understood" the information contained in Edwards'
Global Business Practice Standards, which included the following
regarding conflicts of interest:  "A conflict of interest may
arise when you put your personal interests ahead of the company"
and that "A second job or affiliation with an Edwards competitor
is not allowed" and with a "customer, supplier or provider of
services is discouraged but may be allowed if you obtain written
approval from your manager."  Employees are further advised that
a "significant financial interest" in an EW competitor can give
rise to a conflict of interest, not to put "personal interests
ahead of the Company in ways that could harm Edwards," and to
"[n]ever use Company time or the time and resources of other
employees to promote outside employment ventures or activities
unless authorized by your manager."  Employees are advised that
they "must safeguard confidential information, whether it is

information that belongs to our company or to third parties with which we do business." Confidential information is identified as: (1) "Data, Facts and Knowledge"; (2) "Proprietary Information"; and (3) "Personal Information."

17. According to company records, in September 2012, LU completed online refresher training regarding Edwards' Global Business Practice Standards, which included employee obligations with respect to conflicts of interest and confidential information.

### 3.   Information security procedures at Edwards

18. According to information provided by the company, Edwards takes the following steps to secure its trade secret and proprietary information:

a.   Limiting physical access to the company facility through the use of security guards, electronic identification badges for employees, and limited access to restricted areas within the facility.

b.   Requiring visitor sign-in sheets, visitor badges, and escorts for visitors while on the premises.

c.   Requiring employees to sign confidentiality agreements that extend beyond the term of employment at the company.

11

d.   Marking documents containing trade secrets as confidential and proprietary.  In the case of Standard Operating Procedures ("SOPs"), the following caveat appears:

> THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF EDWARDS LIFESCIENCES, LLC.  IT MUST NOT BE REPRODUCED OR DISCLOSED TO THIRD PARTIES WITHOUT PRIOR WRITTEN PERMISSION OF EDWARDS LIFESCIENCES, LLC

With respect to engineering drawings, the following caveat is used:

> THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF EDWARDS LIFESCIENCES, LLC.  IT MUST NOT BE REPRODUCED OR DISCLOSED OR USED AS THE BASIS FOR THE MANUFACTURE OR SALE OF ANY ITEM OTHER THAN THAT FOR WHICH IT WAS PROVIDED WITHOUT PRIOR WRITTEN PERMISSION OF EDWARDS LIFESCIENCES, LLC.

e.   Annual training and instruction regarding the security and safeguarding of trade secrets based on guidance set forth in the company's Global Business Practice Standards.

f.   Prohibiting publication and disclosure of trade secrets without express authorization from the company.

g.   Data security policies including security banners notifying the employees that their computers are to be used for authorized use only and that their systems may be monitored.

h.   Restricting use of all trade secret information to the performance of company business, and authorizing access on a "need to know" basis.

I.   Requiring confidentiality agreements with third parties or other express authorization from the company prior to disclosure of trade secrets.

**B.   LU's Downloading of Edwards' Trade Secret Information**

19.   On or about May 24, 2012 and June 6, 2012, LU sent documents pertaining to the following confidential products and components to his personal email address at Wenfenglu@hotmail.com:

> **Trade Secret Four:** Proprietary engineering drawings of
> CENTERA components:  laser cut and electropolished
> nitinol tubing; torque shaft sub-assembly; guidewire
> lumen sub-assembly; and delivery cylinder.

20.   On or about February 23, 2012, LU sent documents pertaining to the following confidential products and components to his personal email address at Wenfenglu@hotmail.com:

**Trade Secret Five:**  Photos taken in EW labs of metal cylinders, particulates, valve frames, and sheaths, which primarily document CENTERA test results.

21.  On or about February 20, 2012, LU sent documents pertaining to the following confidential products and components to his personal email address at Wenfenglu@hotmail.com:

**Trade Secret Six:**  PowerPoint presentation on EW Advanced Technology group given at EW internal training session, dated November 22, 2011.

22.  On or about December 22, 2011, LU sent documents pertaining to the following trade secret to his personal email address at Wenfenglu@hotmail.com:

**Trade Secret Seven:**  Internal report authored for EW by LU, entitled "DV 29940 Summary - T22 and T25," dated December 21, 2011

23.  On or about May 7, 2012 and May 23, 2012, LU sent documents pertaining to the following confidential products and components to his personal email address at Wenfenglu@hotmail.com and what appears to be his wife's personal email address at cuixin.zhang@gmail.com (according to the company, Cuixin "Tracy" Zhang is LU's wife):

**Trade Secret Eight:**  Various EW internal emails discussing technical data, forwarding a hand drawing of

14

"crimp balloon"/"burst pressure" and tubing relating to EW's NovaFlex+ Delivery System, and forwarding a vendor's video clip for a presentation exclusively done for EW.

24.  On February 20, 2012, April 12, 2012, April 16, 2012, August 31, 2012, LU sent documents pertaining to technical data of EW products and business intelligence to his personal email address at Wenfenglu@hotmail.com:

25.  LU has also downloaded a number of confidential products and components from the EW network to non-EW USB storage devices regarding technology that is outside the scope of LU's work.  They include the following:

| Date | Trade Secret |
|------|--------------|
| October through December 2011 | **Trade Secret One:**  Standard Operating Procedures manuals, i.e., SOPs.  (According to the company, LU's downloading of numerous manufacturing SOPs together provide a comprehensive and step-by-step guide to the manufacture of the CENTERA transcatheter heart valve.  Examples of these SOPs are: (1) Assembly Instructions for 9500G Transcatheter Heart Valve, SOP5667; (2) Assy Instructions for 9500TFX Transcatheter Valve, SOP5002; and (3) Laser Cutting Procedure, 9500G, SOP5753.  The company has been confirmed that LU downloaded to a USB storage device SOPs setting forth a step-by-step guide on how to attach the CENTERA heart valve to the delivery system and detailed instructions on how to test the system for design verification: (1) THV Centera Assembly Procedure:  Valve to Delivery System |

15

| | Attachment, SOP6251.100; and (2) DV Test Procedure for Maverick 3 Delivery System, SOP6091. |
|---|---|
| July 18, 2012 | **Trade Secret One:**  Standard Operating Procedures manuals, i.e., SOPs. |
| August 28 and 29, 2012 | **Trade Secret One:**  Standard Operating Procedures manuals, i.e., SOPs. |
| UNKNOWN DATE | **Trade Secret Two:**  Technical Summary #30272 – Effects of GLX and Sterilization on Nitinol Fatigue and related technical documents concerning tissue treatment |
| UNKNOWN DATE | **Trade Secret Three:**  SAPIEN XT 29mm Design Requirements Document (According to the company, SAPIEN is a technology that was outside the scope of LU's employment responsibilities) |

C.   **Emails Concerning the Establishment of a Business in the PRC**

26.   Based on the company's review of LU's emails on his work laptop, an email dated May 15, 2012, was found that refers to a contract with a company called Micro-Tech, located in Nanjing, PRC.[1]  Edwards had no current or recent past relationship with Micro-Tech.  According to the company, Micro-Tech's website states as follows: "Using innovation and high standard of qualities systems; we strive to be the best Chinese

_____

[1]  The emails were in Mandarin and were translated by the company.

16

medical device manufacturer in the field of minimally invasive surgery." The site states that the company produces the following products:  non-vascular stent; disposable endoscopic accessories, and peripheral intervention supplies.   The email contains the following pertinent statements:

> From: cmj@micro-tech.com.cn
>
> Subject: Third level balloon/ ball Agreement
>
> To: Dr. Luu  wenfenglu2003@yahoo.com
>
> Cc: jfk@micro-tech.com.cn;  Leng De Rong,
> ldr@micro-tech.com.cn
>
> Date: Tuesday, May 15, 2012, 1:25 AM
>
> Dr Luu, hello
>
>> Attached is the Third level balloon/ ball
>> Agreement, red parts indicate change.  Do you
>> think they're appropriate?
>>
>> Move...APTCCFCertificateChina VisitCook and
>> ev3Dissertation
>
> Best regards,
>
> Chen Meijuan [Chen Mei Juan]
>
> New Product Development Department
>
> Tel:86-25-58646392
>
> 86-25-58646392
>
> Fax:86-25-58744269

Email: cmj@micro-tech.com.cn

http://www.micro-tech.com.cn

MICRO-TECH (NANJING) Co., LTD.

(Nanjing 210061  P.R.China)

LU responded as follows:

From: Wenfeng Lu [mailto:wenfenglu2003@yahoo.com]

Sent: Tuesday, May 15, 2012 3:01 PM

To: cmj@micro-tech.com.cn

Cc: ??? Jin Fu Kang; '???' Leng De Rong

Subject: Re: ?????? Third level balloon/ ball Agreement

"Little" Chen,

    Hello, I just filled out technical requirements
    and the payment methods have been changed a
    little.  Otherwise no objections.  Please give to
    the leaders to re-examine.  Thanks.

Luu (Lv) Wen Feng

LU received a reply later that same day, as follows:

From: Fukang Jin

Attachments:

Leng boss/chief,

    Signal on the train was bad, couldn't reply
    promptly, please excuse.  Chen Mei Juan and I
    discussed and verified the details of the contract

18

and also deliberated with Dr. Luu (Lv). Timing
wise, probably won't be in time for "Apple" to
take to the US, will wait until Dr. Luu to come
back to sign.

Best regards,

Fukang Jin

Chief engineer

cid:__0@Foxmail.net

<tel:86-25-58646380Fax:86-25-58744269>

Tel:86-25-58646366

Cell Phone:86-13914119386

Fax:86-25-58744269

E-mail: cmj@micro-tech.com.cn; jfk@micro-tech.com.cn

MICRO-TECH (NANJING) Co., LTD.

(Nanjing 210061  P.R.China)

According to other emails, LU also contacted the following
persons at Micro-Tech:

mjx@micro-tech.com.cn

hj@micro-tech.com.cn

mzh@micro-tech.com.cn

jfk@micro-tech.com.cn - Jinfu Kang/Kukang Jin, Chief
Engineer

cmj@micro-tech.com.cn

19

ldr@micro-tech.com.cn - Leng Derong

szh@micro-tech.com.cn - Chen Zheng Hua [sometimes
written in English as "Zhenghua Shen"]

27.   In a series of emails between LU and others on
September 14, 16, and 17, 2012, LU asked to have someone
transport a "lab lackage" to the PRC, and deliver it to his
"friend in Shanghai," Li Bing.   Information provided to me by the
company identifies Li Bing as associated with Shanghai Vebery
Biotechnology Co., Ltd., located in a science and technology park
in Shanghai.   While the company appears to be only manufacturing
blood lipid monitors, its website claims the company is
developing cardiovascular products: "Currently in the research
and development of portable atrial fibrillation monitor,
artificial blood vessels, heart and intracranial stent."
According to Edwards, it has neither a current nor recent past
relationship with Verbery, or with Li Bing.   The company could
not determine what was in the lab package.   However, based on my
training and experience, I know that persons sending sensitive
information or technology to a foreign country will often have it
hand-carried because they believe it is safer than using a
commercial carrier such as Fed Ex or DHL.

28.   On September 27, 2012, LU sent an email string to Li
Bing that stated as follows:

20

Hi Li Bing:   I created two emails accounts for you as below: peakmedical_li@hotmail.com, password: peakmedical2012; peakmedical.li@gmail.com, password: peakmedical.   Maybe you can use the above email accounts for the company.   Happy Holiday!   Wenfeng

From LU to Li Bing

Subject:   Beijing

Text:        www.zenithmedical.cn

             www.elite-medical.com

             www.elitemedtech.com

             Beijing Elite [spelled Illett] Medical

             Ming LiU "Treatment Technology" (Beijing Elite Medtech)

             Ming LiU "the best," [power figure, elite, upper group]

From LU to Li Bing

Subject:   Those websites are available

Text:        http://www/primemedical.com

             www.apexmedical.com

             www.peakmedtech.com

             www.zenithmedtech.com

             www.dingfeng.com

21

29.   With respect to the website names identified above, the company's search of LU's emails revealed that he created the following email addresses for himself, which correlate to several of the website names above:

peakmedical_lu@hotmail.com

peakmedical_lu@gmail.com

elitemedical_lu@hotmail.com

zenithmedical@hotmail.com

30.   An email dated September 28, 2012, between LU and Zhenghua Shen at Micro-Tech contained the following exchange:

To: Zhenghua Shen (szh@micro-tech.com.cn)

Subject: More details

Can you check which 2 samples are XXX thanks!

From: szh@micro-tech.com.cn

Subject: improvement of ideas.

Radial Fracture

Hello Dr Luii (WFL)

Balloon production line has an audit.  Ma can plan to begin 10.10 trial.  Please understand.  Last made balloon molding was  31/41 = 77.5%  Broken method mostly due to basic axial fracture.  Two of which were radial fractures.

from: WFL

22.

To: Chen Zheng Hua  (szh@micro-tech.com.cn);

mxj@micro-tech.com.cn

RE: Improvement Ideas

I can't access my Yahoo mailbox so I have to use this one.  I heard in still working in China tomorrow?  If so, can I have everyone make ten 20x55 ball centers?  Broken into two groups (5 per group) Heat Setting 5??(1) The same raw materials, pre-stretched unchanged, Blown front steps parameters unchanged.  But the heat setting needs to decrease by 5 degrees. Heat Setting raise by 10 degrees Lastly, fire quality (?) still 85 degrees. Two hours, raw material doesn't change. Pre-stretch doesn't change.  Blown front steps parameters unchanged.  But heat increase 10 degrees.  The last annealing conditions or 85c, 2 hours.  Lastly fire still at 85 degrees, 2 hours. The total number of samples.  So that we know the yield.  Above 50% is pretty good.  Chen, if you have time tomorrow, please give me the 30 ball centers' broken methods.  Also make the 30 balls. Thank you! Lu Wen Feng.

According to the company, this communication relates to manufacturing and development of a balloon device, which means the effort is further along than something just in the design stages.  The communication appears to concern perfecting a manufacturing process for a balloon device that involves temperature settings in a manufacturing process that involves some kind of plastic or polymer.

31.  The company also found an email string with the most recent email dated September 28, 2012, which discussed business plans, and stated as follows:

> ----- Original message
>
> Sender: Wenfeng Lu <wenfenglu2003@yahoo.com>
>
> Receiver: bizhou ge <bizhouge@gmail.com>
>
> CC:  Bing Li <hikoli@vip.sina.com>
>
> Subject: ShenZhen Inquiry
>
> Date: 9/28/2012 2:26 pm ???2012?09?28? 14?26?
>
> "Little" Ge
>
> > Sorry to bother you.  Not sure if there's been an answer from Shen Zheng.  If there's an opportunity to speak with them, please ask them again about their supplier schedule/ timeline.  Is it 1 to 2 months or more than 3?
> >
> > Early happy holidays to your family!

Wen Feng

On Tue, 9\/25\/12, bizhou ge <bizhouge@gmail.com>
wrote:

From: bizhou ge <bizhouge@gmail.com>

Subject: Re: (MEDTEC China) 9\/26-9\/27

China International Medical Equipment Design and
Technology Expo

To: "Wenfeng Lu" <wenfenglu2003@yahoo.com>

Date: Tuesday, September 25, 2012, 7:07 AM

Wen Feng, Hello

Tomorrow, I will be going to the expo with
Boss/Chief Li to tour the few companies you
recommended and to establish connection/contact
with them.  Also, can you tell me Professor Li's
contact information?  When we are at the expo
tomorrow, we can see if we can meet (because Li
Bing is leaving for Beijing tomorrow night and so
is only available tomorrow to meet).  After
connecting with Shen Zhen multiple times, I
propose we purchase 1 this year and three early
next year.  They were interested in this order
plan and are debating.

Best of luck,

25

Ge Bi Zhou

Wenfeng Lu <wenfenglu2003@yahoo.com Wrote?

Hello you two

Because Shanghai Expo's China Int'l Medical
Equipment Design and Technology Exhibit on the
26-27th will be beneficial to our project
project's future acquisition of raw material and
equipment ordering, I strongly recommend that you
personally or send someone to attend.  If going,
please focus on the following companies and get
the name cards of domestic contacts.   Thank you!

Name

Booth

ZEUS

411

Wacker Chemie AG <Wa Ke Chemistry Ltd (China)>

227

QOSINA

320

NUSIL

503

OPTINOVA

100

26

Accelent

1310

US Royal Mai Si Te  (Master) Grinder Company,

Shanghai Trading Co.

1807

32.  In addition to recommending someone contact companies
at the Shanghai medical exposition, noted above, the company
found email contact between LU and at least one of the companies
listed above, ZEUS Inc., Biomaterials Division, a supplier of
fluoropolymer tubing for medical devices.  The company also found
email contact from LU with the following companies:

> Steeger USA / Hargett & Company - manufacturer of fine
> wire braiders for medical devices
> International Polymer Engineering - design,
> engineering, and manufacturing services for custom
> profile extrusions, including for medical applications
> Biocoat, Inc. - hydrophilic coatings development and
> licensing for medical devices
> Interface USA - balloon catheter manufacturing
> (prototype and production)
> Resonetics - laser micromachining for medical device
> manufacturing

Precision Wire Components - custom medical wire components

The company found a purchase order for a product LU had delivered to his home.  The purchase order, dated July 2, 2012, indicates that LU purchased $600 worth of "Pebax7233 SA01 tubing" from Polymerex Medical Corp. in San Diego for delivery to the Subject Premises.  According to the company, none of the contacts with the companies involved any work being done at Edwards.

33.  On October 8, 2012, defendant received an email referring to financing and a written business model that stated as follows:

TaxTravelWFUYang Xiujiang

Re: Regarding Financing

From: kitmiaocat@yahoo.com.cn

I see that the General Manager is not you.  As long as you trust this person, that's fine.  He's responsible for day to day managing/ spending.  But you as the legal person is responsible/liable for the company's actions.

Wenfeng Lu. wenfenglu2003@yahoo.com wrote

Attached:  entrepreneurial talent enterprises.doc

"Old" [term of endearment] Miao,

28

Hello, listening to your suggestions/ opinion, we will
try our best to fight for government financing first.
See attached.  Nanjing Qinhuai District sent me a
financing application form, but I'm not sure about the
pros and cons of equity/ debt financing.  Which do you
think is better?  Also, does what's written as the
business model in the form make sense/ on topic.
Looking forward to your reply, thank you very much!
Wen Feng

**D.    Travel to the PRC**

34.    Since working at Edwards, LU travelled to the PRC on
the following dates: May 27-June 1, 2012; July 19-24, 2012;
August 3-8, 2012; and September 2012 during the week of Labor
Day.  In so doing LU used all of his accrued vacation time and
then unpaid leave for the trips.  LU told his supervisor that the
trips were necessary for family visits, particularly to visit his
ill mother.  As noted above, however, some of the trips followed
shortly after LU downloaded trade secret information.
Specifically, prior to traveling to the PRC on May 27, 2012, LU
emailed information pertaining to Trade Secrets 4 and 8 to his
personal email account at wenfenglu@hotmail.com and what appeared
to be his wife's personal email account at cuixin.zhang@gmail.com
on May 7, 23, and 24, 2012.  He returned to the U.S. on June 1,

2012 and again emailed information pertaining to Trade Secret 4 to his personal account at wenfenglu@hotmail.com on June 6, 2012 as set forth in paragraph 19, above.   Prior to traveling to the PRC on July 19, 2012, LU downloaded information pertaining to Trade Secret 1 on July 18, 2012.   And prior to traveling to the PRC on Labor Day week, LU downloaded information pertaining to Trade Secret 1 on August 28 and 29, 2012.

**E.   Outside Payments to LU**

35.   According to the company's review of LU's emails, LU has been receiving payments from a source outside of Edwards.   In an email string dated October 1, 2012, between LU and Zhaohui Gao, a cardiologist and instructor at the College of Medicine at Penn State, the following exchange took place:

> From: Zhaohui Gao
>
> Xiao Lu, sorry so long to get back to you, please send the address over, I send the check to you in the past, this month, there should be no problem, I check give you points and send them over, sorry, so a long time
>
> To: Zhaohui Gao
>
> Re: Address
>
> Old Gao
>
> 97 Splendor, Irvine, CA   92618
>
> Cellphone: 949-572-5596

Yes, you can send multiple checks with different date.

I can deposit them only the date on the check.  Please

don't worry too much.  It is a great pleasure if I

helped.  Good luck!

36.  On October 16, 2012, LU received an email from Zhaohui

Gao that stated as follows:

From:  Zhaohui Gao

Hi, Xiaolv,

The check is on the way, I am sorry, now only 8000 is

available, the rest should be available next month.  By

the way, we also change our cell phones, here is mine,

717 8294462. Zhangping is 717-8561075, our home phone

does not change, still is 717-533-1965.  Just update.

Thanks.  Zhaohui

37.  According to the company, it has neither a current nor

past recent relationship with Zhaohui Gao.

**F.  Probable Cause Concerning the Subject Premises**

38.  The address of the Subject Premises, 97 Splendor Drive,

Irvine, is listed as LU's home address in paperwork with Edwards.

39.  On November 15, 2012, FBI agents conducted surveillance

at the Subject Premises and saw LU, whom they were able to

identify from a DMV photo, leave the Subject Premises and drive

31

to work at Edwards.  According to the company, LU lives at the Subject Premises with his wife, and they have two children.

40.  According to the company, a review of its computer system shows that LU remotely accesses the system with the laptop issued to him by Edwards.  As noted above, LU has a number of personal email addresses he uses.  In addition, as noted above, LU has used a thumb-drive to plug in to Edwards' computer system and access documents.  The existence of multiple personal email addresses and the use of a thumb drive suggests that LU has a personal computer or other digital device he uses.  Edwards confirmed that LU accessed his personal email addresses from the office, but never opened the attachments containing the Trade Secrets.  I conclude, that based on my training and experience, that LU must be accessing the attachments containing the Trade Secrets from somewhere other than his office.

41.  On November 15, 2012, LU turned his computer into the Edwards' information technology department.  On Number 16, 2012, according to Edwards, LU attempted to log onto the secured Edwards network using two non-Edwards computers.

42.  Based on my experience and training, and from speaking with other FBI agents who have worked on espionage and trade secret cases, I know that persons involved in transmitting restricted technology from the U.S. to other countries frequently

32

keep materials related to the transfer in their homes.  I know
that in the Chi Mak and Dongfan Chung cases, hundreds of
thousands of pages of proprietary and other restricted
information were found in their homes and they often kept copies
of documents or information they already sent.  In addition
agents found lists requesting specific types of technology.
Based on the evidence that LU is involved in establishing a
medical device company in the PRC, I believe there is probable
cause to believe that information, in either hard copy or digital
form, concerning his efforts to establish that business and what
information he provided to his partners in the PRC will be found
in his home.

G.   **Request for Authorization for Nighttime Search**

43.  According to Air China, LU is scheduled to leave the
U.S. for the PRC departing from LAX at 12:40 a.m. on Saturday,
November 17, 2012.  The company has informed me that LU is not
aware of its investigation of him, and that all steps it has
taken, such as causing his laptop to appear to crash to allow the
company's IT staff to image it, have been done with the goal of
not letting LU know he was under investigation.  This was done to
avoid having LU take flight with company trade secrets already in
his possession.  The FBI intends to arrest LU prior to his
boarding his flight to the PRC to determine if he is carrying any

33

trade secret information with him.  I believe reasonable grounds
exist to conduct the search of his home immediately following his
arrest to avoid the destruction or concealment of any evidence
should his wife or others learn of his arrest prior to 6:00 a.m.
the following day.

VII.  <u>TRAINING AND EXPERIENCE WITH RESPECT TO THEFT OF TRADE</u>
     <u>SECRETS</u>

44.  Based on my training and experience, I know that
individuals who engage in theft of trade secrets often retain the
following types of information, documents, and items in their
possession: (1) the actual trade secrets and other types of
confidential documents or information from the company they took
the information from; (2) records and communications showing the
transfer of that information to other individuals; (3) calendars,
diaries, appointment books, day planners, and other documents or
records showing meetings or communications with other persons and
to which they are transferring the information; (4) documents
evidencing foreign travel to transfer the information; (5)
prototypes, exemplars, or samples of the technology involved in
the trade secret in order to show or transfer to other
individuals; and (6) communications with individuals (a)
regarding development, purchase, testing, transmittal, servicing,
or handling of the products and components of the stolen trade

34

secrets; (b) to foreign businesses or companies, foreign universities, and foreign governments or representatives; © regarding possible new employment or business ventures; and (d) regarding financing options for new companies or businesses.

45.  In addition, I know that individuals who steal trade secrets are also attempting to find buyers at companies, businesses, or universities for the trade secrets.  Individuals will also attempt to start up their own companies in order to develop new products based on the trade secrets.  In order to do this, the individual needs to find a source of funding, which in some cases can be foreign governments.

VIII.   <u>COMPUTER DATA</u>

**TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

46.  As used below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes used to

store digital data (excluding analog tapes such as VHS), and
memory chips; and security devices.  Based on my knowledge,
training, and experience, as well as information related to me by
agents and others involved in the forensic examination of digital
devices, I know that data in digital form can be stored on a
variety of digital devices and that during the search of the
premises it is not always possible to search digital devices for
digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly
technical process that requires specific expertise and
specialized equipment.  There are so many types of digital
devices and software in use today that it is impossible to bring
to the search site all of the necessary technical manuals and
specialized equipment necessary to conduct a thorough search.  In
addition, it may also be necessary to consult with specially
trained personnel who have specific expertise in the type of
digital device, software application or operating system that is
being searched.

b.   Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the integrity
of digital data and to recover "hidden," erased, compressed,

encrypted or password-protected data.   As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.   A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.   A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.   Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers.   Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 240 million pages of data, that, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.   Further, a 500 GB drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost.   Even when such files have been deleted,

37

they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.

e.   Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processor, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has been
deleted from a word processing file).  Virtual memory paging
systems can leave digital data on the hard drive that show what
tasks and processes on the computer were recently used.  Web
browsers, e-mail programs, and chat programs store configuration
data on the hard drive that can reveal information such as online
nicknames and passwords.  Operating systems can record additional
data, such as the attachment of peripherals, the attachment of
USB flash storage devices, and the times the computer was in use.

39

Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment.

f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment.

I.   Other than what has been described herein, to my knowledge the United States has not attempted to obtain this data by other means.

40

ITEMS TO BE SEIZED:

47.   Based on the foregoing, I respectfully submit that there is probable cause to believe that the following items, which constitute evidence of violations of 18 U.S.C. § 371 (Conspiracy) and 18 U.S.C. § 1832 (Theft of Trade Secrets), will be found at the Subject Premises:

a.   All documents originating from or belonging to Edwards Lifesciences Corporation ("Edwards") identified with any of the following markings: "Edwards Lifesciences Corporation," "Edwards Lifesciences, LLC," or "Edwards;"

b.   Any of the following documents: Standard Operating Procedures manuals; Technical Summary #30272; documents pertaining to SAPIEN or CENTERA components or products; photographs taken inside EW laboratories; PowerPoints identified as being originating from or belonging to EW; internal reports authored by Wenfeng LU ("LU") for EW; and communications discussing technical data of EW components or products;

c.   All documents relating to the research, development, design, analysis of EW components or products;

d.   All documents bearing a stamp or notation that restricts the dissemination of such documents;

e.   All documents showing the communication or transfer of any of the items in subparagraphs (a) through (d)

41

above to a person, entity, or email address not associated with
EW;

       f.  All documents tending to identify any person,
entity, or email address in subparagraph (e) above;

       g.  All calendars, diaries, appointment books, day
planners, and other documents or records belonging to LU which
contain entries from first date of his employment with EW on
October 10, 2011 to the present that show meetings or
communications with any person, entity, or email address in
subparagraph (e) above;

       h.  All documents and photographs evidencing foreign
travel by LU from October 10, 2011 to the present;

       I.  From October 10, 2011 to the present, all
documents reflecting LU's communications with individuals outside
of EW (1) regarding development, purchase, testing, transmittal,
servicing, or handling of medical products and devices; (2) to
foreign businesses or companies, foreign universities, and
foreign governments or representatives; (3) regarding employment
or business ventures outside of EW; and (4) regarding financing
options for new companies or businesses;

       j.  Any prototype, sample, or exemplar owned by or
originating from EW.

42

k.    With respect to any digital devices containing evidence falling within the scope of the foregoing search categories, records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show the actual user(s) of the digital device during the time period between October 10, 2011 and the present.

48.  As used above in subparagraphs (a) through (I), the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form, including in digital form on any digital device and any forensic copies thereof.  As used both above and below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes used to store digital data (excluding analog tapes such as VHS), and memory chips; and security devices.

43

49.   In searching digital data stored on digital devices, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The team of law enforcement personnel, which may include the investigating agent(s), and/or individuals assisting law enforcement personnel searching the digital device(s) shall complete the search as soon as is practicable but not to exceed 60 days from the date of execution of the warrant.  If additional time is needed, the government may seek an extension of this time period from the Court within the original 60-day period from the date of execution of the warrant.

b.   The team searching the digital devices will do so only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

I.   The team may subject all of the data contained in the digital device capable of containing items to be seized as specified in this warrant to the protocols to determine whether the digital device and any data falls within the items to

44

be seized as set forth herein.  The team searching the digital device may also search for and attempt to recover "deleted," "hidden" or encrypted data to determine, pursuant to the protocols, whether the data falls within the list of items to be seized as set forth herein.

       ii.  The team searching the digital device also may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

       c.  When searching a digital device pursuant to the specific protocols selected, the team searching the digital device shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

       d.  If the team searching a digital device pursuant to the selected protocols encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that digital device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

       e.  If the search determines that a digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will as soon as

45

practicable return the device and delete or destroy all the forensic copies thereof.

f.   If the search determines that the digital device does contain data falling within the list of the items to be seized pursuant to this warrant, the government will either (I) within the time period authorized by the Court for completing the search, return to the Court for an order authorizing retention of the digital device; or (ii) retain only a copy of the data found to fall within the list of the items to be seized pursuant to this warrant and return the digital device and delete or destroy all the forensic copies thereof.

50.  In order to search for data that is capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items, subject to the procedures set forth above:

a.   Any digital device capable of being used to commit, further or store evidence of the offense listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding or storage of digital data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices and optical scanners;

c.   Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes,

46

CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones and personal digital assistants;

d.   Any documentation, operating logs and reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters and other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, test keys, encryption codes or other information necessary to access the digital device or data stored on the digital device.

51.   The special procedures relating to digital media found in this warrant govern only the search of digital media pursuant to the authority conferred by this warrant and do not apply to any search of digital media pursuant to any other court order.

IX.   <u>CONCLUSION</u>

52.   Based upon the above-stated facts, there is probable cause to support a complaint and arrest warrant for Wenfeng LU,

and to believe that evidence of violations of 18 U.S.C. § 371

(Conspiracy) and 18 U.S.C. § 1832 (Theft of Trade Secrets), will

be found at the Subject Premises.

|s|

_____

Jo-Lein Quarles
Special Agent, FBI

Subscribed and sworn to
before me this 16th day
of November, 2012.



ROBERT N. BLOCK

_____

HON. ROBERT N. BLOCK
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

**Place to Be Searched**

The target location is a two-story detached condominium located at 97 Splendor, Irvine, California, 92618.  It is located in the Woodbury neighborhood of Irvine, California, and is directly east of Sand Canyon Avenue.  The exterior of the structure is beige-colored stucco, and the upper level shutters, garage door, and front door are painted brown.  The garage is attached to the structure, and both the garage and front doors face southwest.  A porch light and the numbers "97" are attached to the structure and are visible directly to the right of the front door.  A small wooden gate is visible to the left of the front door, leading to the rear of the property.

ATTACHMENT B

## Items to be Seized

a.   All documents originating from or belonging to Edwards Lifesciences Corporation ("Edwards") identified with any of the following markings: "Edwards Lifesciences Corporation," "Edwards Lifesciences, LLC," or "Edwards;"

b.   Any of the following documents: Standard Operating Procedures manuals; Technical Summary #30272; documents pertaining to SAPIEN or CENTERA components or products; photographs taken inside EW laboratories; PowerPoints identified as being originating from or belonging to EW; internal reports authored by Wenfeng LU ("LU") for EW; and communications discussing technical data of EW components or products;

c.   All documents relating to the research, development, design, analysis of EW components or products;

d.   All documents bearing a stamp or notation that restricts the dissemination of such documents;

e.   All documents showing the communication or transfer of any of the items in subparagraphs (a) through (d) above to a person, entity, or email address not associated with EW;

f.   All documents tending to identify any person, entity, or email address in subparagraph (e) above;

2

g.    All calendars, diaries, appointment books, day planners, and other documents or records belonging to LU which contain entries from first date of his employment with EW on October 10, 2011 to the present that show meetings or communications with any person, entity, or email address in subparagraph (e) above;

h.    All documents and photographs evidencing foreign travel by LU from October 10, 2011 to the present;

I.    From October 10, 2011 to the present, all documents reflecting LU's communications with individuals outside of EW (1) regarding development, purchase, testing, transmittal, servicing, or handling of medical products and devices; (2) to foreign businesses or companies, foreign universities, and foreign governments or representatives; (3) regarding employment or business ventures outside of EW; and (4) regarding financing options for new companies or businesses;

j.    Any prototype, sample, or exemplar owned by or originating from EW.

k.    With respect to any digital devices containing evidence falling within the scope of the foregoing search categories, records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show

3

the actual user(s) of the digital device during the time period
between October 10, 2011 and the present.

      l.    As used above in subparagraphs (a) through (I),
the terms records, documents, programs, applications or materials
include records, documents, programs, applications or materials
created, modified or stored in any form, including in digital
form on any digital device and any forensic copies thereof.  As
used both above and below, the term "digital device" includes any
electronic system or device capable of storing and/or processing
data in digital form, including: central processing units; laptop
or notebook computers; personal digital assistants; wireless
communication devices such as telephone paging devices, beepers,
and mobile telephones; peripheral input/output devices such as
keyboards, printers, scanners, plotters, monitors, and drives
intended for removable media; related communications devices such
as modems, cables, and connections; storage media such as hard
disk drives, floppy disks, compact disks, magnetic tapes used to
store digital data (excluding analog tapes such as VHS), and
memory chips; and security devices.

      m.    In searching digital data stored on digital
devices, law enforcement personnel executing this search warrant
will employ the following procedure:

I.     Law enforcement personnel or other
individuals assisting law enforcement personnel will, in their
discretion, either search the digital device(s) on-site or seize
and transport the device(s) to an appropriate law enforcement
laboratory or similar facility to be searched at that location.
The team of law enforcement personnel, which may include the
investigating agent(s), and/or individuals assisting law
enforcement personnel searching the digital device(s) shall
complete the search as soon as is practicable but not to exceed
60 days from the date of execution of the warrant.   If additional
time is needed, the government may seek an extension of this time
period from the Court within the original 60-day period from the
date of execution of the warrant.

ii.   The team searching the digital devices will
do so only by using search protocols specifically chosen to
identify only the specific items to be seized under this warrant.

(a)   The team may subject all of the data
contained in the digital device capable of containing items to be
seized as specified in this warrant to the protocols to determine
whether the digital device and any data falls within the items to
be seized as set forth herein.   The team searching the digital
device may also search for and attempt to recover "deleted,"
"hidden" or encrypted data to determine, pursuant to the

protocols, whether the data falls within the list of items to be seized as set forth herein.

       (b). The team searching the digital device also may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

       iii. When searching a digital device pursuant to the specific protocols selected, the team searching the digital device shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

       iv.  If the team searching a digital device pursuant to the selected protocols encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that digital device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

       n.   If the search determines that a digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will as soon as practicable return the device and delete or destroy all the forensic copies thereof.

o.    If the search determines that the digital device does contain data falling within the list of the items to be seized pursuant to this warrant, the government will either (I) within the time period authorized by the Court for completing the search, return to the Court for an order authorizing retention of the digital device; or (ii) retain only a copy of the data found to fall within the list of the items to be seized pursuant to this warrant and return the digital device and delete or destroy all the forensic copies thereof.

p.    In order to search for data that is capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items, subject to the procedures set forth above:

I.    Any digital device capable of being used to commit, further or store evidence of the offense listed above;

ii.   Any equipment used to facilitate the transmission, creation, display, encoding or storage of digital data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices and optical scanners;

iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or

7

memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones and personal digital assistants;

      iv.  Any documentation, operating logs and reference manuals regarding the operation of the digital device or software used in the digital device;

      v.  Any applications, utility programs, compilers, interpreters and other software used to facilitate direct or indirect communication with the digital device;

      vi.  Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

      vii. Any passwords, password files; test keys, encryption codes or other information necessary to access the digital device or data stored on the digital device.

      q.  The special procedures relating to digital media found in this warrant govern only the search of digital media pursuant to the authority conferred by this warrant and do not apply to any search of digital media pursuant to any other court order.