NICOLA T. HANNA
United States Attorney
PATRICK R. FITZGERALD
Assistant United States Attorney
Chief, National Security Division
MARK TAKLA (Cal. Bar No. 218111)
JENNIE L. WANG (Cal. Bar No. 233392)
Assistant United States Attorneys
Terrorism and Export Crimes/Cyber & Intellectual Property Crimes
Sections
     United States Attorney's Office
     411 West Fourth Street, Suite 8000
     Santa Ana, California 92701
     Telephones: (714) 338-3591/(213) 894-2450
     Facsimiles: (714) 338-3561/(213) 894-0141
     Emails:   mark.takla@usdoj.gov/jennie.wang@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. SA CR 12-277(C)-AG |
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | Sentencing Date: 1/28/2019 |
| WENFENG LU, | Sentencing Time: 2:00 p.m. |
| Defendant. | |

Plaintiff United States of America hereby files its sentencing position regarding defendant WENFENG LU ("defendant").  The government's position is based on the attached memorandum of points and authorities, all the files and records in the case, and on such

///

1  further evidence or argument as may be presented at the sentencing

2  hearing.

3   Dated: January 14, 2019            Respectfully submitted,

4                                      NICOLA T. HANNA
                                       United States Attorney
5
                                       PATRICK R. FITZGERALD
6                                      Assistant United States Attorney
                                       Chief, National Security Division
7
                                       *Mark Takla*
8                                      _____
                                       MARK TAKLA
9                                      JENNIE L. WANG
                                       Assistant United States Attorney
10
                                       Attorneys for Plaintiff
11                                     UNITED STATES OF AMERICA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ........................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES ............................ 1

I.  INTRODUCTION ............................................... 1

II.  FACTS ..................................................... 2

    A.  Defendant's Background .................................. 2

    B.  Cook Medical LLC Employment ............................ 2

    C.  ev3/Covidien/Medtronic Employment ...................... 2

    D.  Defendant Desired to Return to China to
        Manufacture and Sell Medical Devices ................... 3

    E.  Defendant Left ev3/Covidien/Medtronic and
        Knowingly Took Its Intellectual Property ............... 5

    F.  Edwards Employment ..................................... 6

    G.  Defendant Attempted to Develop and Manufacture
        ev3/Covidien/Medtronic Technology, Including
        Trade Secret #1 in the PRC ............................ 6

    H.  Defendant Obtained Money from the PRC ................. 10

    I.  Damages to the Victims ................................ 11

III.  GUIDELINE CALCULATIONS ................................... 11

    A.  PSR's Offense Level Calculations ...................... 11

    B.  The Parties' Offense Level Calculations ............... 12

    C.  Criminal History Calculation .......................... 12

V.  ANALYSIS OF THE 18 U.S.C. § 3553(a) FACTORS ................ 12

    A.  Nature and Circumstances of the Offense ............... 12

    B.  History and Circumstances of the Defendant ............ 14

    C.  Seriousness of the Offense, Respect for the
        Law, Adequate Deterrence, and Just Punishment ......... 14

    D.  Kinds of Sentences Available and Policy
        Considerations ........................................ 14

TABLE OF CONTENTS (continued)

PAGE

E.   Need to Avoid Sentencing Disparity...................... 15

VI.   CONCLUSION ................................................ 16

TABLE OF AUTHORITIES

PAGE

FEDERAL CASES

States v. Becerril-Lopez,
    541 F.3d 881 (9th Cir. 2008) .............................. 15

FEDERAL STATUTES

18 U.S.C. § 1832 .......................................... passim

18 U.S.C. § 3553 .............................................. 12

SENTENCING GUIDELINES

U.S.S.G. § 2B1.1 ......................................... 11, 12

U.S.S.G. § 5E1.2 ............................................. 15

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

On May 4, 2018, defendant WENFENG LU ("defendant") pleaded guilty to counts 1, 2, 4, 6, 7, and 8 of the third superseding indictment charging a violation of 18 U.S.C. § 1832(a)(3), (a)(4) (Unauthorized Possession and Attempted Possession of Trade Secrets). (Presentence Investigation Report ("PSR") ¶¶ 2-3.)  The PSR stated the applicable sentencing range was 18 to 24 months of imprisonment, based on a total offense level of 15 and criminal history category of I.  PSR, at 3.  The Recommendation Letter recommended a sentence of 18 months of imprisonment, a three-year period of supervised release, and a special assessment of $600.

The government objects to the PSR's calculations and its use of the 2016 Guidelines Manual.  In defendant's plea agreement, the parties stipulated that the November 2012 Guidelines Manual applied as defendant admitted committing the offenses on November 16, 2012. Consistent with the plea agreement, the government recommends that the Court find a total offense level of 17, a criminal history category of I, and a guideline range of 24 to 30 months of imprisonment.  Along with the recommendations contained in the sealed document filed contemporaneously with this pleading (Document #196), the government recommends a sentence of 27 months of imprisonment, a three-year period of supervised release, a special assessment of $600, and a fine of $5,000 ($10,000 if the Court uses the 2018 Guidelines Manual).  The declarations and exhibits identified herein are attached to the Government's Objections to the Presentence Report.

1                          II.   FACTS

2  A.   Defendant's Background

3       In July 1999, defendant received a Master's Degree in

4  Engineering from the National University in Singapore.   PSR ¶ 110.

5  In 2000, defendant immigrated to the United States to attend a PhD

6  program at Cleveland State University in Ohio.   (PSR ¶ 92.)   In 2004

7  or 2006, he graduated in the top five percent of his class with a

8  Doctor of Engineering Degree.   (PSR ¶¶ 96 (2004); 109 (2006).)

9  B.   Cook Medical LLC Employment

10      After his graduation, defendant was hired as a research and

11 development ("R&D") engineer at Cook Medical LLC in North Carolina at

12 an annual salary of approximately $52,500.   (PSR ¶¶ 96, 119; Kwon

13 Decl., Exh. X.)   While at Cook Medical LLC, defendant led and

14 participated in the development of new products such as a drug-

15 eluting plastic stent and a PTA/PTCA balloon catheter.   (Kwon Decl.,

16 Exh. X.)   When he left his position, defendant affirmed the

17 following:

18          I have returned all company property and understand that
            information obtained as a result of my employment remains
19          the property of Cook and cannot be used by me or divulged
            to a third party without the written permission of Cook.
20

21 (Kwon Decl., Exh. F.)   Despite this affirmation, defendant took 72

22 documents belonging to Cook Medical LLC.   (Kwon Decl. ¶ 4.)   Some of

23 these documents had markings stating that they were confidential and

24 should not be duplicated.   (Id.)

25 C.   ev3/Covidien/Medtronic Employment

26      From January 2009 through October 2011, defendant was a full

27 time R&D engineer at ev3/Covidien/Medtronic in Irvine.   His

28 compensation package included a starting salary of $90,000 per year,

                                    2

a signing bonus of $30,000, an incentive payout of up to 15 percent, 193 restricted shares, and 500 stock options.  (Bon Decl. ¶ 4; PSR ¶ 117.)  While employed at ev3/Covidien/Medtronic, defendant signed an employment agreement prohibiting disclosure of confidential and proprietary information, requiring the return of all confidential and proprietary information to ev3/Covidien/Medtronic at the termination of employment; and stating that all inventions created while at ev3/Covidien/Medtronic were the property of ev3/Covidien/Medtronic. (PSR ¶ 14.)  While employed by ev3/Covidien/Medtronic, defendant worked on the following projects:

- 9F, 8F, and 6F Balloon Guide Catheters for use in a neurovascular thrombectomy system (Trade Secrets #1 and 4);

- Solitaire™ AB remodeling device (Trade Secret #4), a self-expanding stent designed for bridging the neck of an aneurysm with the ability to be fully retrieved (Trade Secret #4); and

- Clot retrieval device with expandable tip (Trade Secret #1).

(Bon Decl. ¶ 6; Kwon Decl., Exh. X.)

D.  Defendant Desired to Return to China to Manufacture and Sell Medical Devices

From 2008 through 2011, defendant sent several emails expressing his desire to return to the People's Republic of China ("PRC"), start a company that developed and sold medical devices, and sell heart valves and other related devices.

On June 30, 2008, defendant wrote to the president of a medical device company in the PRC:

The majority of the overseas Chinese believe that going back to work in China can better realize their self-value. I have been thinking about it vaguely in the past two years, but I didn't find a good platform to do so.  Due to luck I stumbled on Shanghai Industrial Pharmaceutical, with pleasant surprise I found out that it doesn't just have

3

famous medicines, it has medical equipments, optical
equipments, medical devices and pharmaceutical supplies.
It has everything. . . . I understand the leadership of the
group sees the sector of medical devices as of great
importance. . . . <u>I believe that I can bring several
products of high technology added value</u>; besides that, I
can also contribute to the development of the company's
domestic and international market with my already
established connections.

(Kwon Decl. ¶ 10(a); Exh. G (emphasis added).)

On April 10, 2010, defendant sent an email to "Director Yang" with the subject line "Transcatheter Valve Therapy" and attaching a PowerPoint presentation ("PPT") with the same title. Defendant was attempting to get financial support in the PRC for heart valve technology, noting that the global market was $1.1 billion USD. In the PPT, defendant identified Edwards' Sapien valve (Trade Secret #6) and Medtronic as the strongest competitors in the market. (Kwon Decl. ¶ 10(b), Exh. H.)

On April 12, 2010, defendant sent an email to a cardiovascular surgeon at a Chinese hospital. Defendant stated he was creating a start-up company that year and was seeking government funds from Jiangsu and Zhejiang provinces. Defendant asked if the surgeon would provide four to five cardiac surgeons to include on defendant's list of experts for the proposal. (Kwon Decl. ¶ 10(c), Exh. I.)

On May 5, 2010, defendant sent an email to an individual in the PRC and stated that the following medical products were available in the United States: heart valves (Edwards technology); heart stent with drug-eluting (Cook Medical technology); PTCA and PTA ball ductus bursae (believed to be Cook Medical technology). (Kwon Decl. ¶ 10(d), Exh. J.)

On May 17, 2010, defendant sent an email to "President Zhang" in China with a PPT written in Chinese attached. The PPT was similar to

the "Transcatheter Valve Therapy" one he sent to Director Yang on April 10, 2010, and referenced the minimally invasive delivered heart valve competitors, specifically, Trade Secret #6 developed by Edwards and the valves developed by Medtronic.  Defendant stated this technology was going to be "hot" in the next five years because patients experience significant trauma with open-heart surgery and that the minimally invasively delivered heart valves would extend life.  (Kwon Decl. ¶ 10(e), Exh. K.)

On February 15, 2011, defendant sent an email to an individual in the PRC stating that he did not like any of the investors from the north because he "dreamt of living a relaxing life near Yangtze River Delta."  (Kwon Decl. ¶ 10(f), Exh. L.)

E.   **Defendant Left ev3/Covidien/Medtronic and Knowingly Took Its Intellectual Property**

On August 26, 2011, Edwards provided defendant a letter stating it was hiring defendant at an annual salary of $110,000.  (Sirimanne Decl. ¶ 5.)

Despite knowing that he was leaving ev3/Covidien/Medtronic, defendant knowingly took its trade secrets.  On September 30, 2011 (approximately one month after defendant was hired by Edwards), defendant copied 48 documents belonging to ev3/Covidien/Medtronic onto his personal laptop computer.  (Kwon Decl. ¶ 4(a), Exh. C.) From October 14-15, 2011, defendant transferred 799 documents belonging to ev3/Covidien/Medtronic to his personal laptop computer. (Kwon Decl. ¶ 4(b), Exh. C.)  This was not a mistake or accident.  It was a willful and intentional act on defendant's part.

F.    Edwards Employment

On October 10, 2011, defendant signed an employment agreement with Edwards acknowledging that: trade secrets were not to be disclosed, all inventions were the property of Edwards, and trade secrets were not be removed from Edwards' premises.   (Sirimanne Decl. ¶ 6.)   While at Edwards, defendant primarily worked on the delivery system for Trade Secret #7.   (Sirimanne Decl. ¶ 9.)

Despite the employment agreement's cautionary language, defendant transferred Edwards' documents to his personal laptop computer and took them to the PRC.   From November 25-26, 2011, defendant placed 613 documents belonging to Edwards on his personal laptop computer.   (Kwon Decl. ¶ 4(c), Exh. D.)   From August 27, 2012 through September 1, 2012 (immediately prior to his travel to Peking, China September 2-8, 2012), defendant placed 43 documents belonging to Edwards on his personal laptop computer.   (Kwon Decl. ¶ 4(d), Exh. D.)   Despite the fact that defendant repeatedly placed his employers' confidential information on his personal laptop computer, he declined to take any measures to protect it.   (Kwon Decl. ¶ 6.)

G.    Defendant Attempted to Develop and Manufacture ev3/Covidien/
      Medtronic Technology, Including Trade Secret #1 in the PRC

On June 26, 2012, defendant sent an email with a patent application to a PRC patent attorney stating that the application was "for the forth (*sic*) patent."   Two attachments discussed a "minimally invasive interventional thrombectomy system" or expandable tip catheter (Trade Secret #1).   Defendant sent a technical description of the device, photographs, and schematics of prototypes of the expandable-tip catheter that defendant helped develop at ev3/Covidien/Medtronic.   (Kwon Decl. ¶ 10(g), Exh. N.)

6

On June 29, 2012, defendant sent an email to "President Leng" containing a business plan for a "minimally invasive interventional cerebral apoplexy treatment device" (Trade Secret #1") and asked that President Leng "review and correct it." The plan stated that 1.5 million patients die of stroke annually in the PRC. Defendant noted that Western countries have developed an interventional embolectomy (thrombectomy) method to treat acute stroke patients, one of which was the Solitaire FR device of ev3. Defendant stated that the Solitaire FR (referring to Trade Secret #4) did not protect against smaller clots from peeling off from the main blood clot and causing multiple clots. Defendant stated that he had developed a new embolectomy system to address the problems in the Solitaire FR device. In the plan, defendant stated that his team has designated an unnamed intellectual property agency in Nanjing to apply for a PRC intervention patent. Defendant stated that Shanghai Verby Biotechnology Co. and its partners were in charge of marketing the new product and have funding for the first phase of production. Defendant estimated that the annual gross profits for his embolectomy method would be 130 million RMB ($19 million at the December 31, 2012 exchange rate) in the first three years. (Kwon Decl. ¶ 10(h), Exh. O.)

On July 6, 2012, defendant sent an email to L.Z. stating:

I really want to develop and manufacture in China the acute blood clot retrieval device [Trade Secret #1 or #4] that has been clinically used in the U.S. for 3 to 4 years. There are close to 3 million stroke patients in China every year, 70% of them have handicap residual-effect. It is a large expense of social resources. Also, the government is really rich these past few years, normally startup fund is 3 million, it is also highly efficient. I am more tempted now. I will continue my field inspection in Nanjing in two weeks.

1  (Kwon Decl. ¶ 10(i), Exh. P.)

2      On July 15, 2012, LU sent a PRC patent attorney an email with

3  subject line "Intravascular stent with complex functions" (Trade

4  Secret #10) and stating the "attachment is a very important

5  application draft for our team."  The attachment was titled

6  "Technical Disclosure Writing Template" and listed the "Patent

7  Inventor" as defendant.  The document contained a description of

8  Trade Secret #10, complete with proprietary pictures taken at

9  ev3/Covidien/Medtronic.  (Kwon Decl. ¶ 10(j), Exh. Q.)

10      On July 25, 2012, defendant sent an email to D.L. of MicroPort

11  Corporation stating, "Thank you MicroPort for taking care of me! . .

12  . I myself very much would like to work closely with MicroPort.  When

13  we become successful, I will be very willing to adopt your proposal

14  for swapping shares with MicroPort, thus allowing MicroPort to

15  ultimately lead this partnership company.  I can assure you of that."

16  (Kwon Decl. ¶ 10(k), Exh. R.)

17      On July 30, 2012, defendant again sent an email to D.L. of

18  MicroPort Corporation in China stating,

19          Last week's inventory listed out the product design,
            intellectual property (all been applied for patent of
20          invention) and machining know-how that we are very familiar
            with. . . . Personally, I very much need to rely on you and
21          MicroPort.  Not only do I hope to get funding, human and
            resources support from MicroPort, but I also look forward
22          to having your continuous long-term guidance on various
            aspects. . . . Since this partnership company targets
23          cardio-cerebrovascular intervention devices, for the sake
            of long-term development, it is a great choice to set up
24          the headquarters in Beijing. . . . If the animal test to be
            conducted in early 2013 for the mechanical thrombectomy
25          system [believed to be "Trade Secret #1"] is good, our
            technical team will be stationed in China very often to
26          fully support the clinical trial of mechanical thrombectomy
            system, while beginning to research and develop other
27          products.

28

(Kwon Decl. ¶ 10(l), Exh. R.)

On September 2 and 3, 2012, defendant sent two emails to Z.L. in China stating that he was traveling to Beijing and Nanjing, China and asked for help obtaining the company name verification form, opening a temporary bank account, and transferring money into that account. (Kwon Decl. ¶ 10(m), Exh. S.)

On September 7, 2012, defendant sent an email to F.W. stating that the company business license was ready for pickup in 10 days. Defendant stated that two companies including MicroPort Corporation were interested in investing and that defendant proposed to sell 10-15 percent of the company shares for such investment. (Kwon Decl. ¶ 10(n), Exh. T.)

On October 19, 2012, defendant sent an email to L.M. in China asking for help on a financing application form. Defendant attached a financing application form for the "mechanical thrombectomy system for treatment of cerebral apoplexy" (Trade Secret #1). In the application, defendant stated "[t]he largest competitor is U.S. ev3 Company. Its (sic) main product Solitaire FR mechanical thrombectomy system [Trade Secret #4] has an absolute leading position." For his mechanical thrombectomy system, defendant estimated the company profit at 70,000,000 RMB ($10.1 million USD) per year. (Kwon Decl. ¶ 10(o), Exh. U.)

On October 23, 2012, defendant emailed K.H. a plan proposal for a mechanical thrombectomy device (believed to be Trade Secret #1). Defendant stated that he needed additional financing and asked that Huang forward the plan to possible investors. In promoting his product, defendant stated, "The product of my former employer, U.S. ev3 company, has an absolute lead in the market. Director Miao used

1   over 50 sets of that product last year with a success rate of 90%."
2   (Kwon Decl. ¶ 10(p), Exh. V.)

3        On November 10, 2012, defendant attempted to get capital for his
4   fledgling medical device in the PRC by touting that he could make the
5   Solitaire device.  In an email to K.H. in the PRC on seeking
6   additional investment capital, defendant wrote the following in
7   response to questions asked by K.H.:

> Currently there are only three U.S. companies with
> interventional medical device products on the market that
> treat acute cerebral apoplexy. There are good friends of
> ours in all three companies. I would even call them inside
> agents.  Basically, whatever the enemy has, we have, and
> whatever the enemy doesn't have, we still have.  Up until
> now, the Solitaire FR mechanical thrombectomy system made
> by U.S. ev3 company still has the absolute lead.  However,
> the comprehensive function of the mechanical thrombectomy
> system developed by our team matches up to the Solitaire
> FR.  Thus that risk is within manageable range.

14   (Kwon Decl. ¶ 10(q), Exh. V. (emphases added).)

15  H.   Defendant Obtained Money from the PRC

16       Defendant started a business in the PRC and intended to
17  manufacture medical devices using Trade Secrets #1 through #5, and
18  #10 (developed by ev3) and Trade Secrets #6 through #9 (developed by
19  Edwards).  (Plea Agreement ¶ 18.)  In furtherance of his business,
20  defendant applied to the PRC government for funding designed to
21  attract technological talent from places such as the United States,
22  and was selected to receive approximately $2 million RMB (about
23  $328,000 USD) and free rent for a period of three years in a
24  laboratory in a technology park located in Nanjing Province in the
25  PRC.  (Id.)  The money and laboratory space was part of a program
26  sponsored by the PRC government to encourage scientists of Chinese
27  descent to return to the PRC with intellectual property to develop
28  biomedical technology in the PRC.  (Id.)  Defendant intended to

financially benefit himself, his PRC company, and others unrelated to
the victims in stealing these trade secrets. (Id.) In doing so,
defendant's intent was to use the trade secrets to injure ev3 and
Edwards.

On November 16, 2012, defendant was in possession of Trade
Secrets #1 through #10 immediately prior boarding a plane to the PRC
and intended to take Trade Secrets #1 through #10 to the PRC. (Id.)
Defendant possessed Trade Secrets #1 through #10 belonging to both
ev3 and Edwards without authorization and with the intent to benefit
someone other than the trade secrets' owners. (Id.) At the time he
possessed Trade Secrets #1 through #10, he intended to use them to
create competing products in the PRC. (Id.) Defendant intended and
knew that his actions would injure both ev3 and Edwards. (Id.)

I.   Damages to the Victims

Actual loss to ev3 for the theft of Trade Secrets #1, #2, #3,
#4, #5, and #10 was over $200,000 USD. Actual loss to Edwards for
the theft of Trade Secrets #6, #7, #8 and #9 was over $200,000 USD.
(Id.)

### III.   GUIDELINE CALCULATIONS

A.   PSR's Offense Level Calculations

| | | |
|---|---|---|
| Base Offense Level | : | 6 U.S.S.G. § 2B1.1(a)(1) |
| Loss more than $400,000 | : | +12 U.S.S.G. § 2B1.1(b)(1)(G) |
| Acceptance | : | -3 |
| Total Offense Level | : | 15 |

For the reasons stated in the Government's Objections to the
Presentence Report, the government disagrees with the PSR's use of
the November 1, 2016 Guideline Manual. Based on a total offense
level of 15 and a criminal history category of I, the PSR recommended

a guideline range of 18 to 24 months of imprisonment and a fine range of $4,000-$5,000,000.

A.   The Parties' Offense Level Calculations

| | | | |
|---|---|---|---|
| Base Offense Level | : | 6 | U.S.S.G. § 2B1.1(a)(1) |
| Loss more than $400,000 | : | +14 | U.S.S.G. § 2B1.1(b)(1)(H) |
| Acceptance | : | -3 | |
| Total Offense Level | : | 17 | |

Consistent with the parties' stipulation in the plea agreement, the the November 1, 2012 Guidelines Manual should be used.  Based on a total offense level of 17 and a criminal history category of I, the government recommends a guideline range of 24 to 30 months of imprisonment and a fine range of $5,000-$5,000,000.

B.   Criminal History Calculation

The government agrees with the PSR that defendant is in criminal history category I.

V. ANALYSIS OF THE 18 U.S.C. § 3553(a) FACTORS

The government believes that the objectives set forth in 18 U.S.C. § 3553(a) will be met by a low-end sentence of 27 months of imprisonment, a three-year period of supervised release, a special assessment of $600, and a fine of $5,000.  This requested sentence is at the mid-range of the guideline range.

A.   Nature and Circumstances of the Offense

Defendant's conduct was far-reaching and extraordinary, and warrants a mid-range sentence.  Defendant obtained a PhD in the United States and three incredibly well-paying jobs earning upwards of $110,000 per year.  This was apparently insufficient to satisfy defendant's greed, so he decided to steal from his employers. Defendant appears to have begun planning these offenses while working

for Cook Medical LLC.  In 2008, he wrote to a medical device company
in China, stating, "I believe that I can bring several products of
high added technical value."  Defendant left Cook Medical LLC, taking
72 confidential documents with him.

Defendant then appears to have targeted Edwards.  While working
for ev3/Covidien/Medtronic in 2010, defendant sent several emails
noting that the heart valve market in China was "hot" and
specifically stating that Edwards' Trade Secret #6 was one of the
strongest competitors in the world.  He sought employment at Edwards
in 2008 and again in 2011.  After receiving the employment offer from
Edwards, defendant transferred over 800 ev3/Covidien/Medtronic
confidential documents to his personal laptop computer.

In the year he worked at Edwards, defendant received government
funding from the PRC and attempted to obtain additional private
funding for the product he was making using Trade Secrets #1 and 4.
The PRC was sufficiently impressed to provide defendant with $328,000
USD and free rent for three years in a laboratory in Nanjing
Province.  Defendant estimated the profits for the product using
Trade Secrets #1 and 4 to be between $10 and $20 million USD.

The victim companies offered him employment and gave him access
to their most confidential information.  Instead of being content
with a substantial salary, a comfortable life in Irvine, California,
and the opportunity to develop meaningful products that save people's
lives, defendant violated the employee-employer relationship and
stole his employers' information.  Finally in addition to defendant's
own theft, defendant placed his employer's and two former employers'
information at great risk of being stolen by nefarious actors in the
PRC.  Defendant took the information to the PRC several times on his

personal laptop computer without efforts to protect it through encryption or security software.  Defendant's plans were thought out, intentional, willful, and likely would have succeeded if not for the intervention of the FBI.

B.    History and Circumstances of the Defendant

Unlike most defendants sentenced in federal court, defendant was given every opportunity to succeed.  He was born into a loving and well-to-do family in the PRC.  He was smart, educated, and enjoyed relatively good health.  He lived the American dream, eventually moving to Irvine, California, with his wife and two children, and earned a very comfortable salary of over $100,000 USD per year.

He was also a trained engineer with a PhD, an expert in the R&D of medical devices, and a businessman.  He applied these skills to advance his own self-interest to the detriment of his employers. Defendant's history and characteristics show that his conduct here was the result of his deliberate and calculated actions over a significant number of years.

C.    Seriousness of the Offense, Respect for the Law, Adequate Deterrence, and Just Punishment

A significant term of imprisonment is necessary to promote respect for the law, and to deter both defendant and others. Defendant stole trade secrets from U.S. companies while defendant was employed by them.  As can be seen by defendant's profit predictions, the profit margin for such offenses in very high.  In addition, the PRC provides tremendous incentives to encourage individuals like defendant to return to the PRC with intellectual property.  The recommended sentence is both just and commensurate with defendant's conduct, and it will deter others who may contemplate doing the same.

D.   Kinds of Sentences Available and Policy Considerations

For a single count of conviction for violating 18 U.S.C. § 1832, defendant may be sentenced to up to ten years in prison. A sentence of approximately one quarter that length--27 months--is warranted here.

The court shall impose a fine in all cases unless the defendant establishes that he is unable to pay. U.S.S.G. § 5E1.2. In this case, defendant has a total net worth of almost a half a million dollars including substantial equity in a rental property. Some of this money is likely to be used to pay restitution to the victim companies; however, there appears to be money remaining. Defendant claims liquidation of his rental property would result only in $310,000, but this does not make sense as he reported the fair market value as $595,000 and the mortgage balance to be $164,680. The government notes that online databases estimate the property to have a higher fair market value than $595,000 and the rental income estimate to be $3,000. Defendant did not report rental income for this property.

Until December 2017, defendant made approximately $10,000 per month in income. The government's recommended fine is at the low end of the 2012 Guidelines. While the Court may fine defendant up to $5,000,000, a fine of $5,000 is conservative, considering that defendant expected to make $10-20 million from his offenses.

E.   Need to Avoid Sentencing Disparity

A sentence of imprisonment of 27 months is, taking into account the other factors and considerations set forth herein, likely to avoid a disparity with other cases nationwide, particularly where the

total offense level is 17 and 27 months of imprisonment is the mid-range of the resulting advisory Guidelines range.  See United States v. Becerril-Lopez, 541 F.3d 881, 895 (9th Cir. 2008) (observing that sentences within the Guidelines range are unlikely to create a disparity because "it represents the sentence that most similarly situated defendants are likely to receive").

VI.   CONCLUSION

The government recommends that the Court find a total offense level of 17, a criminal history category of I, and a guideline range of 24-30 months of imprisonment.  The government recommends a mid-range sentence of 27 months of imprisonment, a three-year period of supervised release, a special assessment of $600, and a low-end fine of $5,000 ($10,000 if the Court uses the 2018 Guidelines Manual).

Dated: January 14, 2019              Respectfully submitted,

                                     NICOLA T. HANNA
                                     United States Attorney

                                     PATRICK R. FITZGERALD
                                     Assistant United States Attorney
                                     Chief, National Security Division

                                     *Mark Takla*
                                     _____
                                     MARK TAKLA
                                     JENNIE L. WANG
                                     Assistant United States Attorney

                                     Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

I, Stephanie Ascencio, declare:

That I am a citizen of the United States and a resident of or employed in Orange County, California; that my business address is the Office of United States Attorney, 411 West 4th Street, Suite 8000, Santa Ana, California 92701; that I am over the age of 18; and that I am not a party to the above-titled action;

That I am employed by the United States Attorney for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:   **GOVERNMENT'S SENTENCING POSITION**

☐ Placed in a closed envelope for collection and inter-office delivery, addressed as follows:    ☒ Placed in a sealed envelope for collection and mailing via United States mail, addressed as follows: **SEE ATTACHED**

☐ By hand delivery, addressed as follows:    ☐ By email delivery, as follows:

☐ By messenger, as follows:    ☐ By Federal Express, as follows:

This Certificate is executed on **January 15, 2019**, in Santa Ana, California.  I certify under penalty of perjury that the foregoing is true and correct.

Stephanie Ascencio
Legal Assistant

**ATTACHMENT**

DANIEL B. OLMOS
NOLAN BARTON BRADFORD AND OLMOS LLP
600 UNIVERSITY AVE.
PALO ALTO, CA   94301

EUNICE HABIG – USPO
U.S. PROBATION OFFICE
411 WEST 4TH STREET, SUITE 4170
SANTA ANA, CA   92701